UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | |
|---|---|
| REZA YAGHOUBI YEGANEH,<br><br>    Petitioner,<br><br>v.<br><br>WARDEN, BLUEBONNET DETENTION FACILITY, et al.,<br><br>    Respondents. | No. 1:25-CV-121-H |

## ORDER

Nine months ago, U.S. Immigration and Customs Enforcement detained Reza Yaghoubi Yeganeh to facilitate his removal to Iran. Months later, Iran denied ICE's request for travel documents, prompting the agency to explore options for third-country removal. But there has been little progress since. Meanwhile, Yaghoubi Yeganeh has remained in custody—for 272 days at this point—at the Bluebonnet Detention Center.

Before the Court is Yaghoubi Yeganeh's petition for a writ of habeas corpus. Dkt. No. 1. After considering the parties' arguments and the applicable law, the Court concludes that Yaghoubi Yeganeh has shown "no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). The respondents, for their part, concede that they cannot rebut this showing. Dkt. No. 19 at 1. Accordingly, the petition (Dkt. No. 1) is granted. The respondents are ordered to release Yaghoubi Yeganeh on an Order of Supervision within 24 hours of this Order. *See* 8 U.S.C. § 1231(a)(3).

**1.   Background**

Yaghoubi Yeganeh, a lawful permanent resident, was ordered removed to his native Iran in late 2014. *See* Dkt. No. 8 at 40–41. He remained in ICE custody for roughly 90 days

while officials worked to facilitate his removal. *See id.* at 6 ¶¶ 4, 5. When it became clear, however, that Yaghoubi Yeganeh could not be removed to Iran at that time, ICE released him on an Order of Supervision. *Id.* at 6 ¶ 5. The order placed strict conditions on his release, including that he appear in person at ICE's request. *See* Dkt. No. 1-2 at 1. For the next decade, Yaghoubi Yeganeh complied with these conditions. Dkt. No. 1 ¶ 16.

On March 18, 2025, ICE again took Yaghoubi Yeganeh into custody. Dkt. No. 8 at 6 ¶ 6. At the time of his arrest, Yaghoubi Yeganeh was told that his supervision was being revoked because of a renewed likelihood of removal to Iran. *Id.* at 6 ¶ 7.

Yaghoubi Yeganeh remained detained while ICE arranged for his removal.[1] *See id.* at 7 ¶ 9. On June 16—90 days after Yaghoubi Yeganeh's arrest—ICE formally continued his detention, citing his criminal history and the expectation that he would be removed "within the reasonable for[e]seeable future." *Id.* at 49–50.

About a month later, Yaghoubi Yeganeh filed a petition for a writ of habeas corpus alleging that his continued detention violates 8 U.S.C. § 1231, which generally permits the government to detain aliens to effectuate a final order of removal. Dkt. No. 1 ¶¶ 40–42. He also alleged that his detention no longer bears any reasonable relation to a legitimate government purpose, in violation of the Fifth Amendment's Due Process Clause and the government's own regulations. *Id.* ¶¶ 43–49. Through the petition, Yaghoubi Yeganeh asked the Court to order his release on an Order of Supervision, thus restoring the status quo following his initial detention. *Id.* ¶ 50. Yaghoubi Yeganeh is currently detained at the Bluebonnet Detention Center in Anson, Texas. Dkt. No. 1-3.

---

[1] It is unclear what ICE actually did to effectuate Yaghoubi Yeganeh's removal during these first few months. Apparently, the agency did not request travel documents until July 14—nearly four months after Yaghoubi Yeganeh was redetained. Dkt. No. 8 at 7 ¶ 10.

Soon after, the Court directed the respondents to show cause why Yaghoubi Yeganeh's petition should not be granted. Dkt. No. 3. In their response, the respondents maintained that Yaghoubi Yeganeh had not shown that there was no significant likelihood of removal in the reasonably foreseeable future. Dkt. No. 7 at 7. They explained, for example, that the United States, through ICE, had requested travel documents from Iran— an especially complicated scenario due to the ever-changing diplomatic relations between those countries. *Id.* at 6–7. In the respondents' telling, this uncertainty—"where the process of removal to a particular country is closely related to foreign policy judgments and expertise"—required "appropriate leeway" from the Court. *Id.* at 5–6. Because Yaghoubi Yeganeh had not shown that Iran would decline to issue him travel documents, and because "real progress" was being made on his removal, *id.* at 7, the respondents argued that there was a significant likelihood of removal in the reasonably foreseeable future and that Yaghoubi Yeganeh's continued detention therefore complied with all relevant law.

Then the situation began to change. Yaghoubi Yeganeh represented in his reply— later corroborated with an affidavit—that an official with the Iranian Embassy told him that Iran would not issue him documents to reenter the country. Dkt. Nos. 9 at 7; 11-1. Given this new development, the Court ordered the respondents to file a sur-reply addressing Yaghoubi Yeganeh's allegation. Dkt. No. 10. Ultimately, the respondents informed the Court that Iran did, in fact, deny ICE's request for travel documents on September 10. Dkt. No. 14 at 1. Even so, the respondents still justified Yaghoubi Yeganeh's continued detention because of the "possibility of a third-country removal." *Id.*

By that point, the respondents had not explained what steps they had taken or were going to take to facilitate Yaghoubi Yeganeh's removal to a third country. Accordingly, the

Court ordered the respondents to file a written response detailing their third-country removal efforts. Dkt. No. 15. The response, filed on September 30, reported that ICE "sent [the] case to the State Department" upon learning that its travel-document request was denied. Dkt. No. 16 at 3. The State Department began coordinating with ICE to find a country willing to accept Yaghoubi Yeganeh. *Id.* But as of September 30, that process—which, in ICE's words, "does take some time"—was still "ongoing." *Id.* at 3, 7 ¶ 4.

Because the Court "must take appropriate account of the greater immigration-related expertise of the Executive Branch," *Zadvydas*, 533 U.S. at 700, and because the respondents' efforts to remove Yaghoubi Yeganeh to a third country were just beginning in late September, the Court gave the respondents limited time to pursue third-country removal. *See Surovtsev v. Noem*, No. 1:25-CV-160, 2025 WL 3264479, at *7 (N.D. Tex. Oct. 31, 2025) (Hendrix, J.) (explaining that the Court "is obligated to 'giv[e] due weight to the likelihood of successful future negotiations'" concerning third-country removal (alteration in original) (quoting *Zadvydas*, 533 U.S. at 702)). For the next six weeks, the Court did not receive any updates from the respondents about their progress.

In mid-November, 58 days after the respondents first identified the prospect of third-country removal, the Court gave them a "final opportunity" to justify Yaghoubi Yeganeh's detention. Dkt. No. 18 at 2. The Court ordered the respondents to file a response "detailing all efforts to effectuate the petitioner's removal to a third country." *Id.* And they were told to "include any other information that may bear on whether there is a significant likelihood of removal in the reasonably foreseeable future." *Id.*

Two weeks later, the respondents informed the Court that "there is no new information from the State Department about any recent developments" concerning

– 4 –

Yaghoubi Yeganeh's removal. Dkt. No. 19 at 1. "In light of this dearth of available information," the respondents "are not able to provide the Court with updated facts regarding [Yaghoubi Yeganeh's] removal to a third country or a clear assessment of the likelihood of removal in the reasonably foreseeable future." *Id.*

As of today, Yaghoubi Yeganeh has been in ICE detention for 272 days.

## 2. Legal Standards

### A. Writ of Habeas Corpus

"[A]bsent suspension, the writ of habeas corpus remains available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const. art. I, § 9, cl. 2). With 28 U.S.C. § 2241, Congress authorized federal courts to resolve habeas petitions, including in immigration-detention cases. *Zadvydas*, 533 U.S. at 687–88. Habeas exists solely to "grant relief from unlawful imprisonment or custody." *Pierre v. United States*, 525 F.2d 933, 935–36 (5th Cir. 1976). Thus, for the writ to issue, the petitioner must be "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *see Orellana v. Kyle*, 65 F.3d 29, 31 (5th Cir. 1995). A court considering a habeas petition must "determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243.

### B. Immigration Detention Under 8 U.S.C. § 1231

Ordinarily, the government must remove an alien within 90 days of a final order of removal. 8 U.S.C. § 1231(a)(1)(A). During this "removal period," the government "shall detain" the alien. *Id.* § 1231(a)(2)(A). If the alien does not leave the country or is not removed within the removal period, the alien is "subject to supervision." *Id.* § 1231(a)(3). But under Section 1231(a)(6), the government "may" continue to detain certain aliens

beyond the removal period if they are (1) inadmissible, (2) removable because of certain violations, or (3) are a risk to the community or unlikely to comply with the removal order.

By its terms, Section 1231(a)(6) does not impose any time limit on an alien's post-removal-period detention. Faced with "constitutional concerns" about indefinite detention, the Supreme Court in *Zadvydas* addressed how long the government may detain an alien under Section 1231(a)(6) while their removal is pending. 533 U.S. at 682. The petitioners—two resident aliens with criminal histories—were detained under Section 1231 after receiving final removal orders. *Id.* at 684–86. In both instances the government continued to detain the petitioners past the 90-day removal period. *Id.* The petitioners each filed a habeas petition claiming that their continued detention violated due process. *Id.*

The Supreme Court first noted that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem." *Id.* at 690. To avoid these concerns, the *Zadvydas* Court construed Section 1231(a)(6) to permit detention of post-removal aliens only for "a period reasonably necessary to bring about [an] alien's removal from the United States." *Id.* at 689. "[O]nce removal is no longer reasonably foreseeable, continued detention is no longer authorized," *id.* at 699, and the alien is "eligible for conditional release" on an Order of Supervision. *Clark v. Martinez*, 543 U.S. 371, 378 (2005).

Courts measure reasonableness "primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal." *Zadvydas*, 533 U.S. at 699. They must also consider the Executive Branch's immigration expertise, "the serious administrative needs and concerns inherent in the necessarily extensive" efforts to enforce Section 1231, and "the Nation's need to 'speak with one voice' in immigration matters." *Id.* at 700. Further, courts must "listen with care when the Government's foreign policy

judgments, including . . . the status of repatriation negotiations, are at issue, and to grant the Government appropriate leeway when its judgments rest upon foreign policy expertise." *Id.*

"[T]o limit the occasions when courts will need to make" difficult judgments, the Supreme Court recognized in *Zadvydas* a "presumptively reasonable period of detention" of six months. *Id.* at 700–01. After that six-month period, the alien must provide "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. Once the alien has satisfied his burden, "the Government must respond with evidence sufficient to rebut that showing." *Id.* And "as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.* Accordingly, while not every non-removed alien must be released after six months, the parties' relative burdens may change as the duration of an alien's post-removal-period detention stretches on. *See id.*

3.   Analysis

Yaghoubi Yeganeh has been in ICE detention for 272 days—far longer than *Zadvydas*' presumptively reasonable six-month period.[2] *See* 533 U.S. at 701. The first question, then, is whether Yaghoubi Yeganeh has met his initial burden: Is there "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future?" *Id.* The answer is yes. Iran's denial of Yaghoubi Yeganeh's travel documents, combined with the government's admission that it cannot provide "a clear assessment of the likelihood of removal," indicate that there is no significant likelihood of removal anytime soon.

---

[2] Because Yaghoubi Yeganeh has currently been detained for well over six months, the Court need not address his argument that his initial 90-day detention beginning immediately after his 2014 removal order counts toward the statutory clock. *See, e.g.*, Dkt. No. 9 at 4–5.

### A. Yaghoubi Yeganeh has shown that there is no significant likelihood of removal in the reasonably foreseeable future.

To carry his initial burden, Yaghoubi Yeganeh "must present something beyond speculation and conjecture." *Idowu v. Ridge*, No. 3:03-CV-1293, 2003 WL 21805198, at *4 (N.D. Tex. Aug. 4, 2003) (Ramirez, J.). More specifically, Yaghoubi Yeganeh "must demonstrate that 'the circumstances of his status' or the existence of 'particular individual barriers to his repatriation' to [Iran] are such that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* (quotation omitted). The mere "lack of visible progress" in the removal process is not enough. *Id.* (quotation omitted). To shift the burden to the respondents, Yaghoubi Yeganeh must make a non-conclusory showing that "ICE is incapable of executing his removal" in the "near future." *Nagib v. Gonzales*, No. 3:06-CV-294, 2006 WL 1499682, at *3 (N.D. Tex. May 31, 2006) (Sanderson, J.).

Here, there is nothing conclusory about Yaghoubi Yeganeh's argument. As far as the Court is aware, Iran is the only country for which Yaghoubi Yeganeh has any claim to citizenship. Yet Iran denied him travel documents over three months ago. Dkt. No. 14 at 1. Since then, there has been no indication that ICE renewed its request for Iranian travel documents or made any other attempt to effectuate Yaghoubi Yeganeh's removal to Iran. Quite the opposite. ICE immediately switched gears after its document request was denied, noting that it "will likely now pursue the possibility of third-country removal." *Id.* at 4 ¶ 4. With no foreseeable avenue for repatriation to Iran, Yaghoubi Yeganeh has identified "particular individual barriers" preventing his removal in the reasonably foreseeable future. *Idowu*, 2003 WL 21805198, at *4 (quotation omitted).

And although the respondents have every right to explore third-country removal, they have so far made little progress in making it a reality. All they have to show for the last

13 weeks is a request that the State Department begin looking for a country that will accept Yaghoubi Yeganeh.  *See* Dkt. No. 14 at 1.  And as of late November, there is "no new information from the State Department about any recent developments in this regard."  Dkt. No. 19 at 1.  All the while, the duration of Yaghoubi Yeganeh's post-removal-period detention continues to grow.  Now, nine months after his redetention, there is little evidence he will foreseeably be removed to Iran or, for that matter, anywhere else.

While the Court recognizes the importance of deferring to the Executive Branch on immigration matters (hence why it gave the respondents significant time to initiate third-country removal), deference has its limits.  *See Surovtsev*, 2025 WL 3264479, at *7 ("[T]he government cannot succeed merely by showing it has made 'good faith efforts' for which the outcome is not 'impossible.'" (quoting *Zadvydas*, 533 U.S. at 702)).  The Supreme Court made clear that, no matter the deference typically accorded the government on sensitive issues of foreign policy, courts cannot "abdicat[e] their legal responsibility to review the lawfulness of an alien's continued detention."  *Zadvydas*, 533 U.S. at 700.  On this record, Yaghoubi Yeganeh has carried his burden to show that there is no significant likelihood of removal in the reasonably foreseeable future.  *See id.* at 701.

   **B.**  **The respondents fail to meet their burden under *Zadvydas*.**

That leaves the final question: Have the respondents offered evidence sufficient to rebut Yaghoubi Yeganeh's showing?  By the respondents' own admission, they have not.  In their response to the Court's "final opportunity" to justify Yaghoubi Yeganeh's detention, the respondents candidly acknowledged that they "are not able to provide the Court" with "a clear assessment of the likelihood of removal in the reasonably foreseeable future," let alone "updated facts regarding [Yaghoubi Yeganeh's] removal to a third country."  Dkt.

Nos. 18 at 2; 19 at 1. Put simply, the respondents have "brought forward nothing to indicate that a substantial likelihood of removal subsists despite the passage of six months." *Clark*, 543 U.S. at 386. More is required to justify Yaghoubi Yeganeh's continued detention.[3] Therefore, he must be released.

**4.    Conclusion**

In sum, Yaghoubi Yeganeh has shown "good reason to believe" that there is no significant likelihood of removal to Iran or any other country in the reasonably foreseeable future. *Zadvydas*, 533 U.S. at 701. And the respondents concede that they cannot provide the Court with a "clear assessment" to rebut that showing. Dkt. No. 19 at 1. Therefore, under *Zadvydas*, Yaghoubi Yeganeh is entitled to release on supervision. His petition for a writ of habeas corpus (Dkt. No. 1) is granted.

The respondents are ordered to release Yaghoubi Yeganeh from the Bluebonnet Detention Center on an Order of Supervision within 24 hours of this Order.[4] *See* 8 U.S.C. § 1231(a)(3). Upon his release, the respondents are further ordered to file a written notice on the docket notifying the parties and the Court.

So ordered on December 15, 2025.

　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　JAMES WESLEY HENDRIX
　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

---

[3] Because the Court finds that Yaghoubi Yeganeh's continued detention violates Section 1231(a)(6), it need not address his separate argument that the respondents are detaining him in violation of the applicable regulations. *See* Dkt. No. 1 ¶¶ 46–49.

[4] As Yaghoubi Yeganeh acknowledges, the government can track his whereabouts and revoke his release on supervision if it finds a country willing to accept him. Dkt. No. 17 at 4; *see* 8 C.F.R. § 241.4(l)(2)(iii).